# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| RONALD HIBBARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:05-cv-00856-JEO |
| | ) | |
| THE HARTFORD LIFE & ACCIDENT | ) | |
| INSURANCE COMPANY | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter is before the court on three summary judgment motions. The defendant (hereinafter "the defendant" or "Hartford Life") removed this case to this court asserting that the claims of the plaintiff (hereinafter "the plaintiff" or "Hibbard"), couched as state law claims, amounted to ERISA claims and therefore were properly before this court. The plaintiff concedes that the parties are diverse, and thus, properly before this court, but argues in his initial motion for summary judgment that his state law claims for disability benefits are not preempted by ERISA because the defendant is not a fiduciary as that term is defined by 29 U.S.C. § 1002(21)(A). (Doc. 8).[1] The plaintiff has also filed a motion for partial summary judgment regarding reinstatement of his long term disability benefits. (Doc. 10). The defendant has responded to both of the plaintiff's motions (docs. 13 & 17) and has also moved for summary judgment on the plaintiff's claims (doc. 17). On June 6, 2006, the court held a hearing on all three motions. At that time, the plaintiff an requested an additional day to submit supplemental law in support of his motions, which the court allowed. The defendant also requested the

---

[1] References herein to "Doc. ___" are to the document numbers assigned the pleadings by the Clerk of the Court.

opportunity to respond to the plaintiff's supplement.  The court has now considered all of the parties arguments and will address all three motions herein.

**BACKGROUND FACTS**[2]

The plaintiff began working for Picker International in 1979.  He worked there as an installation manager until 1994, when he alleges he became disabled due to vertigo, headaches, and tinnutis.  The plaintiff was a participant in a long term disability plan ("GEC-USA Employees' Welfare Benefit Plan") in connection with his employment.  The plan provides that it is administered by the Company or its designated representatives.

The plaintiff began receiving disability benefits in 1994.  At that time, his treating physician, Dr. George Hashisaki, stated that:

> Mr. Hibbard is currently being treated for a balance problem.  He has evidence of decreased hearing in the left ear and also decreased vestibular or balance function in the left ear.  In addition, he has problems of episodic whirling vertigo, consistent with a disease called Meniere's disease.  He is currently receiving treatment for this problem.  Because the episodes of dizziness are unpredictable, it is not safe for Mr. Hibbard to drive nor [sic] to work around dangerous equipment.

> It would be recommended that Mr. Hibbard receive training in a new job area so that he could be placed in a less dangerous situation.  If it is still required that Mr. Hibbard travel to various locations, then providing a driver for Mr. Hibbard might provide some of his transportation problems.  The problems with his balance would not preclude him from performing administrative, supervisory, or desk based tasks.  The period of his problems with episodes of spinning is, unfortunately, indeterminate.

---

[2]The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the non-moving party as to each motion.  They are the "'facts' for summary judgment purposes only.  They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)."  *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).  The court also notes that the facts generally are not in dispute.  Instead, it is the conclusions derived from the relevant facts that are in dispute.

(Doc. 17 at Ex. 1).[3]

The plaintiff received LTD benefits for seven years.  According to the plaintiff, his LTD benefits were initially paid by CIGNA, a third party beneficiary, until January 1, 1998, when Hartford Life assumed responsibility and liability for a block of LTD benefits for a number of disabled employees including the plaintiff.  (Doc. 11 at Ex. 2; Doc. 17 at Ex. 5).  On January 13, 1998, Hartford Life informed the claimants as follows:

> As you may already be aware, Hartford Life and Accident Insurance Company has acquired all past, current, and future claim liability from Cigna Insurance Company relative to the insured group GEC/USA.  As part of this acquisition, we will be responsible for:  1. The continuation of benefit payments where applicable; 2. For the review and adjudication of any denials and appeals; and 3. For the completion of any other unresolved or pending issues relative to the GEC/USA's group Long Term Disability policy.

(Doc. 11 at Ex. 16).

In 2002, the defendant performed a routine investigation to determine whether the plaintiff was entitled to continued benefits.  As part of its review, the plaintiff was asked to submit additional information, which he did.  (Hibbard Aff.).[4]  The defendant reviewed the following materials: attending physician's statements completed by Dr. George Hashisaki dated November 21, 1994, March 7, 1995, February 6, 1996, December 11, 1996, April 21, 1997, February 10, 1998, December 17, 1998, July 12, 2000, and March 4, 2002; Employer/Employee application for LTD benefits completed on December 20 1994; medical records from Dr. George

---

[3]Exhibit numbers herein are those articulated by the parties on the exhibits themselves, not the electronic filing numbers on the docket sheet.

[4]Hibbard's affidavit is located at document 11, exhibit 1.

3

Hashisaki from September 30, 1994 through June 12, 1996;[5] medical records from Dr. Peter A.

Johnson from June 8, 1994; claimant questionnaire completed on March 2, 2002, by the plaintiff;

telephone interview with plaintiff conducted on March 20, 2002; and, a vocational employability

analysis of the plaintiff completed by Marvin Bryant on April 24, 2002.[6]  (Doc. 17, Ex. 6 at

HIBB 0043-44).  Based upon this information, the defendant determined that the plaintiff was

not totally disabled as that term is defined by the policy.  The plan defines "total disability" as

follows:

> A Participant must be Totally Disabled before benefits will be payable under this
> Plan.  "Totally Disabled" or "Total Disability" means the complete inability of the
> Participant to perform the material duties of his or her regular occupation because
> of an injury or sickness covered under this Plan.  However, after the Participant
> has received a Monthly Benefit for 24 months, "Totally Disabled" or "Total
> Disability" means his or her complete inability to perform the material duties of
> any gainful occupation for which the Participant is reasonably fitted by training,
> education or experience.

(Doc. 11, Ex. 2 at p. 2; Doc. 17 at Ex. 5, at p. 2).

On April 25, 2002, the defendant terminated the plaintiff's benefits.  (Doc. 17 at Ex. 6).

In support of its decision, the defendant noted:

> On 09/30/94, Dr. George Hashisaki wrote a letter indicating you were being
> treated for a balance problem.  He noted you had evidence of decreased hearing in
> your left ear and decreased vestibular or balance function in the left ear.  Dr.
> Hashisaki noted you had episodic whirling vertigo, consistent with Meniere's
> Disease.  [He] recommended that you receive training in a new job so that you
> could be placed in a less dangerous situation.  If travel was required he
> recommended a driver be provided. . . .  He noted that your episodes of dizziness

---

[5]Although the defendant's April 25, 2002, termination of benefits letter states that it reviewed Dr. Hashisaki's record through June 1996, the decision cites Dr. Hashisaki's records though 2001.

[6]The "Employability Analysis Report" is based on the plaintiff's (1) functional capacities as described by Dr. Hashisaki on his March 4, 2002 "Attending Physician Statement;" (2) education; (3) training; and (4) work history.  Bryant determined that the plaintiff had transferrable skills for the following occupations in which he could meet his prior earning capacity: Manager, Professional Equipment and Service; Supervisor, Vendor Quality; and Biomedical Equipment Technician.  (Doc. 12, Ex. 27 at HIBB 0364).

are unpredictable, and it is not safe for you to drive or to work around dangerous machinery.  He further commented that your balance problems would not preclude you from performing administrative, supervisory, or desk based tasks.

[He] noted on the Attending Physician Statement completed on 11/21/94 that; [sic] "The patient's current job requires a significant amount of driving.  Rehab would involve retraining for a job requiring no driving.  The patient continues to have episodes of vertigo and should not be placed in situations requiring normal sense of balance for safety."  Your complications were noted to be a sense of disequilibrium between episodes and severe nausea with episodes.  Also, Unilateral left-sided vestibular weakness was noted.

The treatment notes from Dr. George Hashisaki from 1995 through the present document that you have on average about 4-5 episodes a month of vertigo related to Meniere's disease.  The most recent office visit notes . . . include 4/30/01, where [he] notes you have been stable with about 4 episodes per month . . . It is noted that the duration of your vertigo is "very short in duration, minutes."

The office visit note dated 10/01/01 indicates you have about 3-5 episodes per month.  It is noted that you are currently off Dyazide.  There is no significant change in your hearing.  Your word discrimination was slightly improved up to 48% in your ear.

The most recent Attending Physician Statement . . . gives a diagnosis of Meniere's disease.  The restrictions and limitations assigned by Dr. Hashisaki include: "standing unlimited, walking unlimited, except when experiencing vertigo, sitting unlimited, lifting/carrying unlimited, reaching/working overhead is limited when experiencing vertigo, pushing/pushing [sic] unlimited, driving limited by vertigo spells, keyboard use/repetitive hand motion unlimited."  It is noted, "Patient has limitations with activity due to balance/dizziness problems."

We have taken into consideration the restrictions and limitations provided by Dr. Hashisaki, which indicate that you have about 4-5 episodes of vertigo each month.  It appears . . . that the episodes last a very short duration, for a few minutes.  Our assessment of the medial information received to-date including the restrictions and limitations provided by Dr. Hashisaki, is that you should not work around dangerous machinery or drive. . . .  It appears your prior occupation as an Installation Manager may have involved working around dangerous machinery.

There is no evidence that you could not perform work in an occupation on a full-time basis not involving driving or working around dangerous machinery.

We conducted a vocational assessment of your claim to see if you would qualify

> to perform any gainful occupation for which you would reasonably be fitted by training, education or experience, based on your policy definition of "Totally Disabled", and we have identified . . . 3 occupations in which you would possess transferable skills to perform on a full-time basis. . . .
>
> These occupations were identified based on demonstrated supervisory and equipment installation coordinating skills. You[r] background has also showed you are able to work with others and your technical and electronic background matches the occupations above. These identified occupations either meet or exceed your monthly Hartford gross benefit amount of $2661.71, and are prevalent in the national economy.

(Doc. 17 at Ex. 6). The plaintiff appealed the defendant's denial of benefits on June 18, 2001.

(Doc. 14 at Ex. E). On July 23, 2002, Dr. Hashisaki noted in a letter that the plaintiff's condition had not changed since his first evaluation. (Doc. 12 at Ex. 30). On September 11, 2002, Dr. Neil Crowe wrote a letter "To Whom it May Concern," stating as follows:

> Ronald Hibbard is followed in this office for Meniere's disease. His recurrent, severe vertigo persists. He is having four to five episodes a month of disabling vertigo, constant tinnitus, and frequent and severe headaches, all of which render him unable to be productively employed.
>
> I would ask that you res-institute [sic] the benefits allowed him while covered by HICA. It is not clear as to why his coverage was terminated as his symptoms have remained unchanged.

(Doc. 12 at Ex. 32).

Dr. Brian Mercer conducted an appellate review of the plaintiff's medical records. During the review, Dr. Hashisaki represented to Dr. Mercer that the plaintiff was capable of working at a full-time sedentary capacity, which did not require working on ladders or heights or driving. (Doc. 12 at Ex. 34). After completing the appeal review, Hartford informed the plaintiff on December 17, 2002, that he was not "Totally Disabled" as defined by the policy and that his benefits would no longer be paid. (Doc. 12 at Ex. 37). In so doing, Hartford noted:

According to the medical review of the claim, Mr. Hibbard has been diagnosed with Meniere's disease and a headache disorder.  He suffers from attacks of vertigo approximately 3-5 times per month and these episodes last generally from 5-10 minutes.  His Meniere's disease was categorized by Dr. Hashisaki on 11/6/97 as "relatively mild Meniere's disease."  Dr. Hashisaki also states in his letter of July 23, 2002 that there has been no change in Mr. Hibbard's Meniere's disease since July 25, 1994.  While Dr. Crowe has opined that Mr. Hibbard cannot work full time because of his symptoms of headache and degree of vertigo reported, he did defer any opinion of work to Dr. Hashisaki.  Dr. Hashisaki stated that based on Mr. Hibbard's diagnosis of Meniere's disease, he felt that Mr. Hibbard could work at a full-time sedentary capacity, which did not require working on ladders or heights or driving.

With respect to Mr. Hibbard's headaches, Dr. Crowe reports that he has 4-5 episodes of severe headaches per month.  Overall, these are felt to be a mixed cephalgia with a stress related component.  According to Dr. Mercer, most individuals with headache disorders of the [sic] nature are capable of functioning at a full-time light labor category.  He states that there are no additional restrictions or limitations for the headache disorder to be added to those outlined for the Meniere's disease.

In making our initial claim determination we used limits and restrictions provided to us by Dr. Hashisaki on the Attending Physician's Statements he completed.  After our appeal review and Independent Medical Review, we find that there are no changes in the limits as recommended by Dr. Hashisaki.  We find that the Employability Analysis completed by Marvin Bryan dated April 24, 2002 does not need to be altered and as a result, we continue to find that there are occupations that Mr. Hibbard has the functional capacity, training and education to perform.  As a result, we find that further benefits are not payable and Mr. Hibbard is not Totally Disabled from any occupation.

(Doc. 12 at Ex. 37).

## SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.

2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden

to show the district court, by reference to materials on file, that there are no genuine issues of

material fact that should be decided at trial.  Only when that burden has been met does the burden

shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that

precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991);

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of

material fact, or by showing that the nonmoving party has failed to present evidence in support of

some element of her case on which she bears the ultimate burden of proof.  *Celotex,* 477 U.S. at

322-23; *see* FED. R. CIV. P. 56(a) and (b).  Once the moving party has met her burden, Rule 56(e)

"requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324.  The nonmoving party

need not present evidence in a form necessary for admission at trial; however, the movant may

not merely rest on the pleadings.  (*Id*.).

After a motion has been responded to, the court must grant summary judgment if there is

no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c).  The substantive law will identify which facts are material and which are

irrelevant.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202

(1986).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at

249.

**DISCUSSION**

**ERISA Preemption**

The first issue involves whether the plaintiff's claims are preempted by ERISA.  The law

is clear, as stated by the Eleventh Circuit in *Butero v. Royal Maccabees Life Insurance Company*,

174 F.3d 1207 (11th Cir. 1999):

> . . . .  Here's the rule: ERISA superpreemption exists only when the
> "plaintiff is seeking relief that is available under 29 U.S.C. § 1132(a)."  *Whitt,* 147
> F.3d at 1330.  Regardless of the merits of the plaintiff's actual claims (recast as
> ERISA claims), relief is available, and there is complete preemption, when four
> elements are satisfied.  First, there must be a relevant ERISA plan.  *See id.; Kemp
> v. International Business Machs. Corp*., 109 F.3d 708, 713 (11th Cir. 1997).
> Second, the plaintiff must have standing to sue under that plan.  *See Engelhardt v.
> Paul Revere Life Ins. Co*., 139 F.3d 1346, 1350 n.3 (11th Cir. 1998).  Third, the
> defendant must be an ERISA entity.  *See id*.; *Franklin v. QHG of Gadsden, Inc*.,
> 127 F.3d 1024, 1029 (11th Cir. 1997); *see also Morstein v. National Ins. Servs.,
> Inc.,* 93 F.3d 715, 722 (11th Cir. 1996) (en banc) (no preemption at all--not even
> defensive preemption--when the defendant is "a non-ERISA entity" and the
> claims do not "affect relations among principal ERISA entities as such").  Finally,
> the complaint must seek compensatory relief akin to that available under
> § 1132(a); often this will be a claim for benefits due under a plan.  *See
> Engelhardt*, 139 F.3d at 1354; *Franklin*, 127 F.3d at 1029.

*Butero*, 174 F.3d at 1212.

In the instant case, the plaintiff argues that ERISA does not preempt his claims "because

Defendant was paid valuable consideration for assuming liability for a bulk of active LTD claims

including Plaintiff's claim.  When Hartford assumed liability of Plaintiff's benefits, the benefit

plan was no longer sponsored by or provided by Plaintiff's former employer."  (Doc. 8 at p. 1).

Specifically, the plaintiff argues that Hartford is not a fiduciary, and thus, it is not an ERISA

entity.

Reviewing the record, it is evident that three of the four elements have been met,

9

requiring the court to treat the plaintiff's claims as falling within ERISA.  First, the disability

plan in question (doc. 11 at ex. 2; doc. 17 at ex. 5) is an ERISA employee welfare benefit plan.

Second, the plaintiff has standing under the plan as a participant therein.  Finally, the plaintiff's

claim is for a breach of the terms of the plan.  Thus, the only element at issue is whether Hartford

is an ERISA entity.

> ERISA provides the statutory definition of "fiduciary."   It states:
>
> Except as otherwise provided in subparagraph (B), a person is a fiduciary with
> respect to a plan to the extent (i) he exercises any discretionary authority or
> discretionary control respecting management of such plan or exercises any
> authority or control respecting management or disposition of its assets, (ii) he
> renders investment advice for a fee or other compensation, direct or indirect, with
> respect to any moneys or other property of such plan, or has any authority or
> responsibility to do so, or (iii) he has any discretionary authority or discretionary
> responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  ERISA entities are the employer, the Plan, the Plan fiduciaries, and

the beneficiaries under the Plan.  *Morstein v. Nat'l Ins. Services, Inc.*, 93 F.3d 715, 723 (11th Cir.

1996).  An ERISA entity is one that can "control . . . the payment of benefits" and the

"determination of [a claimant's] rights" under an ERISA plan.  *Butero*, 174 F.3d at 1213 (quoting

*Morstein*, 93 F.3d at 723).

Since 1998, Hartford Life has had the authority and discretion to investigate the plaintiff's

claims of disability.  According to the January 13, 1998, letter sent to claimants informing them

that Hartford Life had taken over their claim liability from Cigna Insurance Company relative to

the insured group GEC/USA, Hartford Life was responsible for (1) the continuation of benefit

payments where applicable; (2) for the review and adjudication of any denials or appeals; and,

(3) for the completion of any other unresolved or pending issues relative to GEC/USA's group

Long Term Disability policy.  (Doc. 14 at Ex. B).  Moreover, the plaintiff executed at least three medical releases allowing Hartford Life to obtain the medical records necessary to administer his claim, all of which contain the language that "I understand that the information obtained by use of this Authorization will be used for the purpose of evaluating and administering a claim for benefits."  (Doc. 14 at Ex. C).  Additionally, Hartford Life is the entity that made the decision to terminate the plaintiff's benefits and the entity that handled the appeal of the denial of benefits.  "When an insurer makes such a decision [to deny benefits under a Plan] it is plainly wearing its fiduciary hat."  *Cotton v. Massachusetts Mutual Life Ins. Co.*, 402 F.3d 1267, 1291 (11th Cir. 2005).  While the plaintiff argues that "Hartford is not administering an employee benefit plan sponsored by an employee," and "[e]ven though it makes discretionary decisions, it has never been delegated discretionary authority and [has] never been named a fiduciary under the plan," the court finds otherwise.[7]  (Doc. 15 at p.4)

> The Supreme Court has stated that:
>
> ERISA defines fiduciary as any person "to the extent . . . he has any discretionary authority or discretionary responsibility in the administration of [an employee benefit] plan." § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii). . . .  Also, ERISA § 503, which specifies minimum requirements for a plan's claim procedure, requires plans to "afford a reasonable opportunity to any participant whose claim has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."  29 U.S.C. § 1133(2).  This strongly suggests that the ultimate decisionmaker in a plan regarding an award of benefits must be a fiduciary and must be acting as a fiduciary when determining a participant's or beneficiary's claim. . . .  Classifying an entity with discretionary authority over benefits determinations as anything but a plan fiduciary would thus conflict with ERISA's statutory and regulatory scheme.

---

[7]On June 2, 2006, the plaintiff filed his "Supplemental Argument in Support of Summary Judgment on ERISA" (doc. 27) and a "Submission of Agreement of Hartford to Assume LTD Liability" (doc. 28).  The court's opinion, however, is unchanged by these filings.  In fact, the Hartford Agreement bolsters the court's opinion that Hartford is indeed the administrator and fiduciary of the Plan.

*Aetna Health Inc. v. Davila*, 542 U.S. 200, 220, 124 S. Ct. 2488, 2502, 159 L. Ed. 2d 312 (2004).
As stated previously, the record clearly reflects that Hartford had decision making authority over
the plaintiff's claim.  Based on the foregoing, the court finds that Hartford is a fiduciary as that
term is defined by ERISA, the Supreme Court, and the Eleventh Circuit, and thus, the plaintiff's
claims are preempted by ERISA.  The plaintiff's motion for summary judgment on this issue
(doc. 8), therefore, is due to be denied.

## TERMINATION OF BENEFITS

### ERISA Standards of Review

The parties dispute what standard of review is applicable in this case.  The plaintiff
argues that the *de novo* standard applies because "there is no grant of discretionary authority to
Hartford."  (Doc. 9 at p. 3).  The defendant argues that "the plan language expressly grants
discretion to the plan administrator."  (Doc. 17 at p. 9).  The Eleventh Circuit has recently
articulated the distinctions between the ERISA standards of review as follows:

> *De novo* review, which we employ in reviewing "no-discretion" plan
> decisions, offers the highest scrutiny (and thus the least judicial deference) to the
> administrator's decision.  In fact, we accord no deference there, since, no
> judgment/discretion was exercised in making the determination (*i.e.*, there is no
> discretion to which we would defer).
>
> In contrast, where the administrator has discretion (*i.e.*, applies his own
> judgment) in making plan decisions, we review under the arbitrary and capricious
> standard (which is substantively the same as the "abuse of discretion" standard,
> *Shaw*, 353 F.3d at 1284-85 n. 6).  We use it to avoid judicial second
> guessing/intrusion by according the most judicial deference (and thus, the least
> judicial scrutiny).
>
> Finally, where the administrator has discretion but exercises it under a
> conflict of interest, we apply "heightened arbitrary and capricious" review.  There
> we apply a level of deference (and conversely, scrutiny) somewhere between what
> is applied under the *de novo* and "regular" arbitrary and capricious standards.

In *HCA*, we incorporated these varying levels of judicial review in a multi-step approach.  For clarity, we recapitulate that approach (240 F.3d at 993-95) in a simpler version here, for use in judicially reviewing virtually all ERISA-plan benefit denials:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); [  ] if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," [ ] then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds [ ] supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1137-38 (11th Cir. 2004).

The court's first task, then, is to determine whether Hartford Life was granted discretion.

In the instant case, the plan language provides that:

**"Claims Administrator"** means the Company or the persons or entities appointed by the Company to serve as a Claims Administrator under the Plan with responsibility for the review and payment of claims (and recordkeeping related thereto) under one or more Welfare Benefit Programs, and, to the extent directed by the Company, to exercise its discretion in the review of claim payments (including eligibility for benefits claimed) and claim denials under the applicable Welfare Benefits Program . . . .

(Doc. 17, Ex. 9 at HIBB 0004).  The LTD plan further provides:

13

> [T]he Administrator shall have the following discretionary powers, rights and duties:
>
> (a)   To determine all questions arising under the Plan, including the power to determine the rights or eligibility of employees or Participants . . . and the amounts of their benefits under the Plan, and to remedy ambiguities, inconsistencies or omissions.  Any such determination by the Administrator shall be binding on all persons.

(Doc. 11, Ex. 2 at p. 13; Doc. 17, Ex. 5 at p. 13).  Based upon this language, the court finds that Hartford Life was granted discretionary authority to review and determine eligibility of claims.[8] However, the court also finds that the heightened arbitrary and capricious review is appropriate here because the court cannot conclude at this juncture that Hartford Life was not acting under a conflict of interest.

While the original plan documents provide that "plan benefits . . . shall be paid by the trust" (doc. 17, ex. 9 at HIBB 0008), in its response to the plaintiff's request for admission, Hartford Life admits that "it agreed to provide the long term disability benefits offered under a plan previously provided by Greensboro Associates, Inc., the benefits of which had previously been self-funded and claims administered by CIGNA."  (Doc. 18).  At this stage, viewing the evidence in the light most favorable to the plaintiff, the court concludes from this assertion that Hartford Life was paid to assume liability for (both administration of and funding for) the plaintiff's long term disability benefits.  It would, therefore, not be in Hartford Life's financial

---

[8]The plaintiff places great weight on the fact that "Hartford" was not specifically named in the plan as administrator or fiduciary.  However, the court finds this to be of little import.  The plan must simply grant discretionary authority to the "administrator."  It need not name that administrator specifically in the plan.

14

best interest to continue paying the plaintiff long term disability benefits.[9]  As such, the

heightened arbitrary and capricious standard of review is appropriate here.

### Was the Decision Wrong?

The next question before the court is whether Hartford Life's decision to terminate the

plaintiff's benefits is wrong.  *Williams*, 373 F.3d at 1138.  The defendant argues that its decision

to terminate the plaintiff's benefits is supported by the record.  The plaintiff asserts that the

decision was wrong because the defendant has failed to show that his condition had improved

and "therefore failed to show that disability benefits should be terminated."[10]  (Doc. 20 at p. 3).

In examining whether Hartford Life's decision to terminate the plaintiff's benefits was

---

[9]*See Levinson v. Reliance Standard Life Insurance Co.*, 245 F.3d 1321 (11th Cir. 2001) ("Because Reliance pays out to beneficiaries from its own assets, however, a conflict of interest exists between its fiduciary role and its profit making role. Thus, the proper standard in this case is a heightened arbitrary and capricious standard.")

[10]In support of his motion and in response to the defendant's motion, the plaintiff relies on *Levinson*, 245 F.3d 1321, as a basis for his argument that Hartford must show that he is no longer disabled because a cryptic note from the plaintiff's claim file reads "Any Occ approved."  (Doc. 11 at Ex. 15).  The court finds, however, that *Levinson* is readily distinguishable from the instant case and that the portions of *Levinson* that the plaintiff cites are taken out of context of the entire opinion.

In *Levinson*, the district court reviewed the defendant's decision to deny the plaintiff benefits and concluded that the denial was arbitrary and capricious.  *Levinson*, 245 F.3d at 1325.  The lower court then held a bench trial to determine damages. The defendant argued that the court should either remand the claim for it to determine benefits or limit the evidence of damages to that in the administrative record.  The court found that the defendant had failed to prove that the plaintiff's condition had improved and awarded the plaintiff benefits through the date of trial.  *Id.*

The defendant then appealed to the Eleventh Circuit, which found, among other things, that: (1) the proper standard for the case was a heightened arbitrary and capricious standard; (2) the defendant's decision was arbitrary and capricious because it was not supported by the record; (3) the court's refusal to remand for a determination of benefits owed was proper because the defendant had the opportunity to gather evidence contradicting the plaintiff's before trial but did not do so until after the litigation began; and, (4) the district court had not erred in determining that the plaintiff "did not cease to be disabled." *Levinson*, 245 F.3d at 1331.

Although the plaintiff places great weight on the part of the court's opinion regarding the determination of whether the defendant proved that the plaintiff was no longer disabled, that part of the opinion is of no relevance to the instant case.  In *Levinson*, the plan at issue provided that benefits would not terminate until "the date [the claimant] ceases to be permanently disabled," or "the date [the claimant] fails to furnish the required proof of Total Disability."  *Id.*  The plan language in the instant case is distinct from that in *Levinson* as set out in this opinion.

Construing the evidence in the light most favorable to the plaintiff, based upon the claim file entry noted above, it does seem as if, at some point, the Administrator had approved his "total disability" claim after the 24 month period.  However, nothing in the plan suggests that a disability determination cannot be reevaluated and changed.  The fact remains that the plan language in the instant case requires a showing of not being able to work at any occupation after receiving monthly benefits for twenty-four months.

wrong, the court must first determine whether the plaintiff had a disability as that term is defined under the applicable LTD Plan.  Reviewing the records in chronological order, the court will begin with Dr. Hashisaki's letter of September 30, 1994.  The letter unequivocally recommends that Mr. Hibbard "receive training in a new job area so that he could be placed in a less dangerous situation" and that "[t]he problems with his balance would not preclude him from performing administrative, supervisory, or desk based tasks."  (Doc. 17 at Ex. 1; Doc. 11 at Ex. 4).  Dr. Hashisaki's "Attending Physician's Statement," dated November 21, 1994, states that the plaintiff was totally disabled from his own occupation at that time but was only totally disabled in **any** occupation through September 30, 1994.  (Doc. 11, Ex. 3 at p. 2) (emphasis added).

Shortly thereafter, Dr. Hashisaki completed an "Attending Physician's Statement of Functional Capacity."  (Doc. 11 at Ex. 5).  In that statement, Dr. Hashisaki again stated that the plaintiff was not totally disabled in **any** occupation but was totally disabled for his occupation. (*Id*. at p. 2) (emphasis added).  It reaffirmed that he was able to "resume work activities" on September 30, 1994.  (*Id*.).  Dr. Hashisaki's next "Attending Physician's Statement" is dated March 3, 1995.  (Doc. 11, Ex. 10 at p. 2).  In it, his opinion of the plaintiff's work status remains unchanged.  (*Id*.).

On July 12, 1996, Dr. Hashisaki sent a letter along with the plaintiff's records dating back to October 1995, to Donna Johnson, CIGNA Benefit Analyst, wherein he stated:

> Ronald Hibbard is being treated and followed by me for multiple medical conditions.  These conditions are: 1) Meniere's disease, endolymphatic hydrops; 2) unilateral sensorineural hearing loss; and 3) unilateral vestibular loss.  He continues to have four to five episodes of disabling, whirling vertigo each month.
>
> He was last seen and evaluated on April 22, 1996.  His work status continues to be indeterminate in terms of returning to work to his occupation.

16

The current condition complicating his work is the disabling, episodic and whirling vertigo.  These episodes occur without warning.  Also, with the unilateral vestibular dysfunction, his balance is impaired.  He will be unable to work at any high elevation or in a position where good balance is critical.  With his unilateral hearing loss, he will experience some difficulty in communicating with people in situations where there is conflicting background noise.

He continues to receive medical treatment for Meniere's disease.  His condition is currently unchanged.

(Doc. 11 at Ex. 6).  Dr. Hashisaki's March 20, 1997, note states that Mr. Hibbard has four to five episodes of vertigo each month lasting two to three minutes each and he will continue on Dyazide.  (Doc. 11 at Ex. 13).  It does not reference his ability to work other than to state that he "is on disability."  (*Id*.).

On his "Attending Physician's Statement" dated April 21, 1997, Dr. Hashisaki stated that the plaintiff's present job could not be modified to allow for his impairment but that the plaintiff was a suitable candidate for vocational rehabilitation services.  (Doc. 11, Ex. 14 at p. 2).  The next "Attending Physician's Statement" is dated February 10, 1998.  (Doc. 11, Ex. 17 at p. 2).  Dr. Hashisaki noted thereon that the plaintiff's ability to stand, walk, lift/carry, and reach overhead was unlimited except during episodes of vertigo; his ability to sit, push, pull, and use a keyboard or repetitive hand motions was unlimited; and that he should not work on ladders at elevated heights.  (*Id*.).  On his next "Attending Physician's Statement," dated December 17, 1998, Dr. Hashisaki noted that the plaintiff's progress was unchanged.  (Doc. 11, Ex. 18 at p. 2).  He also recommended that the plaintiff not drive.  (*Id*.).

After the plaintiff's May 13, 1999, office visit, Dr. Hashisaki noted that "[the plaintiff] has been getting around well with no problems ambulating or doing other activities at this point. . . .  In assessment, the patient is doing well with his Meniere's disease.  He is taking Dyazide on

an as needed basis and hasn't used it recently . . . ."  (Doc. 11 at Ex. 19).  The next "Attending

Physician's Statement" is dated July 12, 2000, and notes that the plaintiff's progress is

unchanged and that the patient's ability to stand, walk, sit, lift/carry, reach/work overhead, push,

pull, drive, and use a keyboard is undetermined.  Dr. Hashisaki also notes that the patient's

"limited balance ability limits safe activity."  (Doc. 11 at Ex. 20).

After the plaintiff's April 30, 2001, office visit, Dr. Hashisaki noted that he "has been

stable with about 4 episodes per month. . . .  He does have left side tinnitus, which is unchanged.

His duration of vertigo is very short in duration, minutes."  (Doc. 12 at Ex. 23, HIBB0150).  The

plaintiff returned to Dr. Hashisaki on October 1, 2001, when Dr. Hashisaki noted that "He still

has about 3-5 episodes per month.  He is currently off Dyazide.  He reports no significant change

in his hearing."  (Doc. 12 at Ex. 23, HIBB0151).[11]

The plaintiff's next visit with Dr. Hashisaki was on June 3, 2002, when Dr. Hashisaki

noted that:

> HISTORY: Mr. Hibbard is a 54-year-old . . . with a longstanding history of
> debilitating Meniere's disease.  He has, despite medical therapy, 4-5 episodes of
> whirling vertigo per month with severe onset of nausea and vomiting lasting
> several hours.  In addition to that, he has several other very, very brief episodes of
> symptoms multiple times a month as well . . . .
>
> . . . .
>
> IMPRESSION/PLAN: Debilitating Meniere's disease. . . . options including
> surgical intervention and transtympanic steroids were discussed. . . .  Mr. Hibbard
> consented to transtympanic steroid injections, which were performed today at the
> conclusion of his visit here.  We will plan to see him back in 4-months or sooner
> should there be any worsening of his symptoms.

(Doc. 12 at Ex. 29, HIBB0503).

---

[11]These records precede the defendant's termination of benefits on April 25, 2002.  The following records reflect the
plaintiff's treatment subsequent to termination of benefits and during the appeal process.

On August 20, 2002, the plaintiff underwent an MRI which revealed:

1.  A moderate focal area of ischemic demyelination in the mid right centrum semiovale and several smaller similar areas of ischemic demyelination in the more apical cerebral white matter bilaterally.
2.  Arachnoid cyst anterior to the left temporal lobe which is considered an incidental finding.
3.  Cerebellopontine angles are unremarkable, the brain stem and cerebellum are normal.  Evidence of acute cerebral infarction is not seen.

(Doc. 12 at Ex. 31).  The plaintiff followed up with Dr. Neil Crowe on September 11, 2002, after his MRI.[12]  Dr. Crowe noted that his plan was as follows:

[R]eview his recent MRI scan and compare it with the previous one and . . . get records from Dr. Hashisaki.  There is really little that can be quite affective [sic] in controlling these symptoms.  There is a vestibular dysfunction clinic at the hospital which we could refer him to.  He may benefit from scopolamine patches.

At this point he is so angry with the failure of the system to support that we have offered to do what we can to help him recover his disability as he does remain disabled from his ability to work due to these profound episodes of vertigo.[13]

(Doc. 12, Ex. 33 at HIBB 0400).  In his miscellaneous transcription notes, he also states, "Due to the profoundly disabling nature of this recurrent and persisting vertigo, the patient in financially wiped out and apparently due to acquiescence of picker [sic] by other companies he has now lost his financial means of support."  (*Id*. at HIBB 0401).

---

[12]Prior to this visit with Dr. Crowe, the plaintiff last saw Dr. Crowe in May 1994, at which point his "differential was Meniere's disease, benign positional vertigo or remotely, a focal seizure disorder."  (Doc. 12, Ex. 13 at HIBB0401).

[13]On September 11, 2002, Dr. Crowe wrote a letter "to whom it may concern" stating:

Ronald Hibbard is followed in this office for Meniere's disease.  His recurrent, severe vertigo persists.  He is having four to five episodes a month of disabling vertigo, constant tinnitus, and frequent and severe headaches, all of which render him unable to be productively employed.

I would ask that you res-institute [sic] the benefits allowed him while covered by HICA.

It is not clear to us why his coverage was terminated as his symptoms have remained unchanged.

(Doc. 12 at Ex. 32).

19

In resolving this issue, the court must apply the definition of a "disability" under the LTD Plan to the plaintiff's situation to determine whether the decision to terminate his benefits was *de novo* wrong. As stated previously, the Plan provides as follows:

> A Participant must be Totally Disabled before benefits will be payable under this Plan. "Totally Disabled" or "Total Disability" means the complete inability of the Participant to perform the material duties of his or her regular occupation because of an injury or sickness covered under this Plan. **However, after the Participant has received a Monthly Benefit for 24 months, "Totally Disabled" or "Total Disability" means his or her complete inability to perform the material duties of any gainful occupation for which the Participant is reasonably fitted by training, education or experience.**

(Doc. 11, Ex. 2 at p. 2; Doc. 17, Ex. 5 at p. 2) (emphasis added). Reviewing the evidence in the record that was before Hartford Life in light of this definition, the court cannot conclude that Hartford Life's termination of disability determination was *de novo* wrong. Hartford Life sought out and received relevant information and records concerning the plaintiff's condition. Various tests, evaluations, and consultations were conducted.

On January 14, 2002, and February 21, 2002, Hartford Life requested that the plaintiff provide it with an Attending Physician Statement, an Authorization to Obtain and Release Information, and a Claimant Questionnaire. (Doc. 12 at Exs. 21 & 22). On the claimant questionnaire, the plaintiff indicated that he was unable to drive, operate heavy equipment, operate power tools, work with electricity, or climb due to his vertigo, and that he had "monster" headaches with weather changes, and constant ringing in his left ear. The plaintiff also indicated that he did not need assistance with his daily activities and that a typical day consisted of him getting up at six in the morning, drinking coffee with his wife, "hanging out" at home all day, sending and receiving some email, "lots of tv," and going to bed around eleven. The plaintiff also reported that before his disability, he enjoyed drum and bugle corps, fishing, hunting,

reading, swimming, archery and roller skating.  Since his disability, he observes "drum and bugle corps," he went fishing twice in 2001 but must now wear a life jacket at all times, and reads a limited amount because the continuous eye movement results in vertigo and headaches.  (Doc. 12 at Ex. 24).  On the "Attending Physician's Statement" dated March 4, 2002, Dr. Hashisaki noted that the plaintiff's progress remained unchanged.  (Doc. 12 at Ex. 25).

Dr. Brian Mercer, a Board Certified Neurologist underwent a "Medical Record Review" of the plaintiff which he submitted to Hartford Life on December 3, 2002.  (Doc. 17 at Ex. 3).  Dr. Mercer reviewed the records of Dr. Peter Johnson, Dr. Neil Crowe, and Dr. George Hashisaki and spoke with Dr. Hashisaki and Dr. Crowe.  Dr. Hashisaki indicated to Dr. Mercer that Mr. Hibbard could work at a full-time sedentary capacity that did not require working on ladders or heights or driving.  (Doc. 12 at Ex. 34).  Dr. Crowe indicated to Dr. Mercer that he did not think Mr. Hibbard could work on any full-time basis "because of his subjective symptoms of headache and degree of vertigo reported" but that he "was being seen by Dr. Hashisaki, who is a local expert in vestibular disorders and Meniere's disease . . . [and] . . . [he] would defer any opinion of work capabilities to Dr. Hashisaki.  (Doc. 12, Ex. 36 at p. 2 (HIBB 0130)).  Dr. Mercer concluded:

> Based on the objective information contained in the medical records, the records indicate that Mr. Hibbard would not be precluded from functioning at a full-time sedentary to light DOL labor category with restrictions.  The restrictions are that he should not work at unprotected heights, around moving machinery or operate a motor vehicle where loss of balance would be of danger to himself or others.  This opinion is supported by the following facts.  In between the episodes of whirling vertigo, Mr. Hibbard's examinations have been generally normal except for rare instances of mild gait unsteadiness.  The records indicated he generally felt well in between the episodes.  The attending physician's statements from Dr. Hashisaki indicated that there are no limitations in sitting, standing, walking, lifting, and other functions except when he was symptomatic with vertigo.  Dr. Hashisaki himself, recommended retraining in a sedentary administrative-type occupation

21

in September of 1994.  He also agrees with these restrictions/limitations as outlined in our recent telephone conversation.  Although there is an approximate 60% left-sided hearing loss, this is well compensated with the normal right hearing resulting in an overall 10% binaural hearing loss, which should not significantly affect functionality in a sedentary to light occupational level. . . .

. . . .  [T]here are no additional restrictions or limitations for the diagnosis of his headache disorder to be added to those outline above for his Meniere's disease.

The referral form asks "Beyond pure functional capacity, what is the likelihood of claimant's sustaining work-related activities with this condition?"  Assuming that Mr. Hibbard is motivated to return to the workforce, assuming that an employer is flexible to allow him to stop working for four to five times per month for five to ten minutes during a severe vertigo episode, there is a good likelihood that [he] could sustain work related activities with his condition of Meniere's disease (with the above noted restrictions/limitations) . . . .

(Doc. 12, Ex. 35 at pp. 5-6 (HIBB 0126-27)).[14]  Based upon the foregoing, Hartford Life concluded that the plaintiff was not totally disabled from working in any occupation as defined in the applicable plan.

The evidence is adequate to contradict the plaintiff's claim that he was unable to perform "the material duties of any gainful occupation for which [he] is reasonably fitted by training, education or experience."[15]  Dr. Mercer's medical record review found that he could work in a limited capacity and Dr. Hashisaki, who has been treating the plaintiff since 1994, stated that he could work at a full-time sedentary capacity.

A fair amount of the evidence that contradicts the plaintiff's claim that he was disabled comes from the plaintiff's doctor.  These statements, as set out herein, indicate that at the

---

[14]Dr. Mercer notes in the concluding paragraph that "Dr. Hashisaki indicates that it is difficult to quantify Mr. Higgard's Meneire's Disease in this manner [('as being relatively mild' as it was in 1997)]."  (*Id*. at HIBB 0127-28).

[15]In his supplement (doc. 30), the plaintiff argues that the administrator cannot add an "objective evidence" requirement to the Plan's definition of disability.  While the court agrees with this premise of law, it finds that it is inapplicable to the instant case.  Hartford Life's basis for terminating the plaintiff's benefits was his treating physician's continuing assertions that he was capable of performing some type of work, which is precisely how the Plan defines "Total Disability."  The defendant did not add a requirement that there be objective evidence.

relevant times, the plaintiff has been capable of working certain jobs other than as an installation manager.

The plaintiff's own assertion and that of Dr. Crowe are not enough in the present record to support a finding that Hartford Life's decision is *de novo* wrong.[16]  By concluding that the plaintiff has not met his burden in this matter, the court is not suggesting that he does not have significant medical difficulties.  To the contrary, the court simply concludes that he has not met the applicable definition in the policy.  The court is convinced that he is does have a disability in the general sense.  However, he is not disabled under the strict definition that this court must apply and follow in reviewing Hartford Life's application of the LTD Plan.[17]

Because the court finds that no grounds exist to disturb Hartford Life's LTD Plan determination under the *de novo* review standard, the plaintiff's request for reinstatement of long term benefits under the LTD Plan is due to be denied.[18]  The court has no authority to grant such benefits under the present circumstances.

---

[16]Particularly where Dr. Crowe had not seen the plaintiff since 1994 and where he defers to Dr. Hashisaki's opinion. (Doc. 12 at Ex. 17).

[17]The plaintiff submitted a June 2, 2005, vocational analysis in support of his motion.  (Doc. 12 at Ex. 40).  In that analysis, the Rehabilitation Specialist opines that the plaintiff is unable to work and has a 100% loss of employability.  That opinion, however, is not part of the court's consideration at this time because it was not before Hartford Life at the time it made its termination of benefits decision.  Because it is that decision to terminate benefits that is currently before the court, it would not be appropriate for court to consider evidence that was not considered in making that decision.  *See Jett v. Blue Cross and Blue Shield*, 890 F.2d 1137, 1139 (11th Cir. 1989) (the court is to review "the facts as know to the administrator at the time the decision was made").  Nothing in this opinion, however, precludes the plaintiff from seeking reinstatement of benefits should the Plan allow now that he has evidence of being disabled from "any" occupation.

[18]Even had the court found Hartford Life's decision to be *de novo* wrong, the court still would not have grounds to disturb its decision.  As stated previously, Hartford Life was vested with discretion in reviewing claims.  Furthermore, Dr. Hashisaki's repeated medical notes regarding the plaintiff's ability to perform certain work constitute more than "reasonable" grounds for Hartford Life's termination of the plaintiff's benefits.  Although Hartford Life was acting under a conflict of interest as it both administered the claims and paid the claimant's benefits, the court cannot conclude that the decision terminating his benefits was reversible under the heightened arbitrary and capricious standard in light of the foregoing.

## CONCLUSION

Premised on the foregoing, the court finds that the plaintiff's motions for summary judgment (doc. 8 & 10) are due to be denied and the defendant's motion (doc. 17) is due to be granted.  Accordingly, judgment is due to be entered in favor of the defendants and against the plaintiff.  An appropriate order will be entered.

**DONE**, this the19th day of June, 2006.

**JOHN E. OTT**
United States Magistrate Judge

24